# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KODY MURPHY and
KRISTAN MURPHY,

    Plaintiffs,

v.

EXCEL SITE RENTALS LLC,

    Defendant.

No. 4:17-CV-02353

(Judge Brann)

## MEMORANDUM OPINION

### JULY 26, 2019

**I. BACKGROUND**

Plaintiffs, spouses Kody and Kristan Murphy, are pursuing a negligence action[1] against Defendant Excel Site Rentals, LLC. In their amended complaint[2], Plaintiffs are seeking punitive damages based on the circumstances surrounding a November 10, 2017 work-site accident that injured Kody Murphy.

Excel has moved for summary judgment.[3] It first asks the Court to dismiss the action in its entirety, asserting that the Commonwealth of Pennsylvania's hoary 'assumption of the risk' doctrine bars this action. In the alternative, if the Court does not dismiss the action in its entirety, Excel has moved for partial summary judgment seeking to dismiss the demand for punitive damages.

---

[1]   The parties agree that jurisdiction in this matter is predicated on diversity.
[2]   September 26, 2018, ECF No. 39.
[3]   May 14, 2019, ECF No. 57.

The motion has been fully briefed and is now ripe for disposition; for the reasons that follow, and on both bases for relief, it is denied.

## II. DISCUSSION

### A. Standard of Review

I begin my analysis with the standard of review which undergirds summary judgment. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."[4] Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[5] "Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[6] "A defendant meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[7] "A plaintiff, on the other

---

[4] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[5] Fed. R. Civ. P. 56(a).

[6] *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and *Celotex*, 477 U.S. at 322).

[7] *Clark*, 9 F.3d at 326.

hand, must point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[8]

"The inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."[9]  Thus, "if the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."[10] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[11]  "The judge's inquiry, therefore, unavoidably asks . . . 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'"[12] The evidentiary record at trial, by rule, will typically never surpass that which was compiled during the course of discovery.

---

[8]  *Id.*

[9]  *Liberty Lobby, Inc.*, 477 U.S. at 252.

[10] *Id.*

[11] *Id.*

[12] *Id.* (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 447 (1871)).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[13] "Regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[14]

Where the movant properly supports his motion, the nonmoving party, to avoid summary judgment, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[15] For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by: (i) "citing to particular parts of materials in the record" that go beyond "mere allegations"; (ii) "showing that the materials cited do not establish the absence or

---

[13] *Celotex*, 477 U.S. at 323 (internal quotations omitted).

[14] *Id.*

[15] *Liberty Lobby*, 477 U.S. at 250.

presence of a genuine dispute"; or (iii) "showing . . . that an adverse party cannot produce admissible evidence to support the fact."[16]

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"[17]  Moreover, "if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."[18] On a motion for summary judgment, "the court need consider only the cited materials, but it may consider other materials in the record."[19]

Finally, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[20]  "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a

---

[16] Fed. R. Civ. P. 56(c)(1).

[17] *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003) (Weis, J.).

[18] Fed. R. Civ. P. 56(e)(2).

[19] Fed. R. Civ. P. 56(c)(3).

[20] *Liberty Lobby*, 477 U.S. at 249.

verdict for that party."[21] "If the evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted."[22]

### B. Undisputed Facts

With that standard outlining the Court's framework for review, I now turn to the undisputed facts of this matter.

Kody Murphy was employed by Consolidated Well Services in Texas. He volunteered to travel to Pennsylvania to work on the Chief Oil & Gas Company work-site identified as the 'Yoder 2H pad' near Granville Summit, Bradford County, Pennsylvania. Excel Site Rentals, LLC, hereinafter "Excel," was also subcontracted by Chief Oil & Gas Company to perform work at the Yoder 2H pad. "Excel provided the completion rig, swivel unit, and other related equipment as well as personnel to operate and maintain its equipment on the Yoder 2H pad well site."[23]

Consolidated Well Services' role as a subcontractor to Chief Oil & Gas was "to provide snubbing as well as well pressure control services at the Yoder 2H pad."[24] Murphy worked as a snubbing operator for Consolidated Well Services. He only worked at the Yoder 2H pad work site on two dates, the date of the injury,

---

[21] *Id.*

[22] *Id.* at 249–50 (internal citations omitted).

[23] Defendant's statement of material facts, ECF No. 57-1.

[24] *Id.*

- 6 -

November 10, 2017, and the previous day. For the two days Murphy worked at the Yoder 2H pad, his Consolidated Well Services supervisor was Josh Pippen.

### 1. Deposition Testimony of Kody Murphy

On November 9, 2017, Murphy's first day on the job site at the Yoder 2H pad, he worked a 12-hour shift, from 7:00 a.m. to 7:00 p.m. Just prior to the night shift change, he noticed the swivel unit spin.[25] That was the first time that Mr. Murphy noticed that something was "amiss."[26]

When asked during his deposition 'what he did with that knowledge,' he explained that he discussed "it" with another Consolidated Well Services employee, Erik Skinner, and also "passed on the knowledge to the guys coming on."[27] Murphy also notified Patrick Carnahan, an Excel employee, who was also the "closest supervisor," as well as to Murphy's immediate supervisor, Josh Pippen.[28]

Murphy continued: "Me and Skinner throughout that day had relayed, you know, information back and forth and kept telling Carnahan, told Pippen, and then from them, it's just kind of if it doesn't move from them, it's either possibly losing your work at that location or your job, period, or try to work as safety [sic] as

---

[25] Kyle Murphy Deposition Testimony, ECF No. 60-4.

[26] *Id.*

[27] *Id.*

[28] *Id.*

possible. And having a family, I was trying to keep my job, as well as be safe."[29] Murphy explained that Carnahan "didn't do anything about it," and Pippen: "said to see if it's still doing it in the morning, if night shift had any problems, which night shift didn't give us any hand-over notes about their operations. They just kind of came on and switched out, and then when we first saw it again, we brought it – me and Skinner both brought it up to Carnahan again."[30]

Murphy continued explaining: "At that point, you know, it could have been just from rigging it up. And we had come back the next day, and it had started spinning on us again while we were doing the drill outs, and it was inherently in neutral."[31] When asked 'why it would continue spinning,' he explained, "Failure of components. If it's – if it's in neutral, it's supposed to be dead neutral. You know, the only other answer is there's a failure in components either in the controls or in the spool itself."[32] When asked: "Is that in and of itself a dangerous condition?" He replied, "Yes, sir."[33]

On November 10, 2017, Murphy was working the same twelve-hour shift as the prior day. Murphy spoke to the same Consolidated Well Services employee who had relieved him the previous evening and to whom Murphy expressed his

---

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

concerns about the 'spin out.' That employee did not have any problems with the equipment on the overnight shift.

On the day of the incident, Murphy was alternating working in the snubbing basket with Erik Skinner. While in the snubbing basket, Patrick Carnahan was operating the swivel unit. Around 3:00 p.m. that afternoon, while wearing work gloves supplied by Consolidated Well Services, Murphy was "up" in the basket for what he remembers to likely have been the third time that day "making swivel connections"[34] when his left hand got stuck in the equipment. He was spun around in the air twice by the equipment before he fell to the floor of the basket. Murphy lost his fingertip and broke both of his arms.

Once back on the ground, Josh Pippin was the first to reach Murphy and drove him to the nearest hospital. Murphy underwent several operations in Pennsylvania and continued to see an orthopedic specialist upon his return to Texas. At the time of his deposition, he would see his physician monthly, but no longer required the use of pain medications.

Murphy testified that "anyone onsite," had the authority to stop the work because of a dangerous condition.[35] He continued: "It can literally be anyone coming into contact onto that site. The security guard from the booth could say,

---

[34] *Id.*

[35] *Id.*

'Hey, I see something wrong,' and come up there and shut it down, but you have to go through your necessary supervisors to get that type--"[36]

Murphy was also asked if he could 'get in trouble for bringing that up.'[37] He responded that: "It's kind of a hit and miss thing. There's a rule – kind of an unspoken rule in the oil field to not stop operations, but that didn't stop me from bringing it up to Pat Carnahan several times."[38] He testified that employees who complain about potential problems and waste operating time typically would either get fired or moved to a different rig.[39]

Erik Skinner had also complained to Carnahan about the equipment. Murphy elaborated that Carnahan did not act on Skinner's complaints either, which created an unsafe work environment for both men. Murphy testified that Carnahan "brushed it off;"[40] and that "from what Erik Skinner said, he brushed him off pretty harshly that day, and that's what prompted us to go back to Pippin again, but I don't know if Pippin was going to going to act on it or not."[41] Murphy continued, "the first day [Carnahan] said, 'We always get crappy equipment.'"[42] "At that point in time, I really couldn't tell if it was a fluke or not, so I took Josh's advice

---

[36] *Id.* Murphy was interrupted by counsel and never finished that answer.
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.*

and watched it again the next day. It started doing it again, and we started bringing it up again."[43]

Murphy further testified that he only witnessed problems with the equipment on November 9, 2017. He explained:

> It wasn't until the very end of my shift, that first one, and I had went to go put my hand to push it over…and it had started rolling after I had put my hand on it. So I pulled away, and I waited until it stopped, watched Carnahan adjust levels. He had sped it up and then put it back into neutral. It stopped, so pushed it over. Nothing happened. Sat it in there, and that was the first time that day I had saw it.
>
> The second time that it happened it was the next time I had went up right before I told Josh Pippen about it again, and I had – doing the same motion, pushing over it had rolled out of my hand and swung back, and I yelled at Carnahan that we needed to fix this, and he said, 'Well, when I get my bag oil,' and then continued on. And about that time, as soon as I got it made up, Erik Skinner had come up, and I went down, and that's when I had the long conversation with Pippen about it.[44]

When asked what he believed to have caused the accident, Murphy testified that it was "failure to shut down the job because if they would have listened to our pleas about the equipment, it would have never happened."[45]

### 2. Deposition Testimony of Patrick Carnahan

At the time of Murphy's injury, Patrick Carnahan was working as a rig operator for Excel.[46] He never received any training from Excel to perform his job

---

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] ECF No. 60-8.

as a rig operator;[47] the only training he received from Excel was "first aid, CPR, forklift, manlift, and that was it."[48]

Carnahan testified that he was aware of the Employee Safety Handbook, but had never gone "through it thoroughly."[49] However, he knew that according to the handbook, he was to 'be looking for unsafe conditions at all times,' and all employees were responsible for reporting unsafe working conditions.[50] He was not the supervisor at the time of the injury; the supervisor was not on the job site at the time of the injury.[51] When asked who was in charge of the job site that day since the supervisor wasn't on site, Carnahan replied, as follows:

> Q: Okay. Who was the lead man on the job at the time of the injury for your company?
>
> A: It would be myself.
>
> Q: All right. So were you the supervisor on the job at the time of the incident then?
>
> A: I ain't taking that responsibility.[52]

Carnahan had seven years' experience with the type of swivel unit that caused Murphy's injuries.[53] Excel never provided Carnahan with a user, operator,

---

[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.*

repair, maintenance, or troubleshooting manual about the swivel unit.[54]  He testified that Excel had a "safety guy" who was responsible for ensuring the equipment is safe for use, explaining: "Our safety guy comes out, and he does his job.  I don't know what he does, but that's his job to go over everything…It's not an everyday inspection.  It's whenever he comes out, he does rig inspections and equipment inspection."[55]   However, on November 10, 2017, neither Carnahan, nor any other employee of Excel, checked the operational safety of the swivel unit.[56]

Carnahan did not "recall" Erik Skinner and Murphy advising him that the swivel unit was turning when it should have remained stationary.[57]  In fact, Carnahan attempted to minimize any evidence of malfunction by refusing to use the word 'turning' and instead describing the unit as 'creeping.'[58]

### 3. Deposition Testimony of Erik Skinner

Erik Skinner testified that he did indeed tell Patrick Carnahan that the swivel was malfunctioning, stating: "I said, We need to shut this down, get this fixed.  His answer was, We need to get this done because we have another well we have to do."[59]  Skinner testified that not only did he 'make it clear' to Carnahan that there

---

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] ECF No. 60-5.

was a potential equipment malfunction, but that Carnahan "could, obviously, see the same thing."[60] "Basically, the answer was, You guys can either do it or we'll get somebody else that will."[61] "I said something to him about it at least four or five times…He would either ask about the bag oil, or Don't worry about it, quit being a pussy…You know, Just get it done."[62]

Skinner left the basket "pretty pissed" because Carnahan knew the unit was malfunctioning before Murphy was injured, yet refused to shut down the unit, despite Skinner's protestations.[63]

**C.     Analysis**

  **1.     Assumption of the Risk**

When adjudicating a state law claim pursuant to its diversity jurisdiction, a federal court applies the substantive law of the forum state[64]—here, Pennsylvania. Although disfavored and narrowly applied, assumption of the risk remains a viable affirmative defense under Pennsylvania law.[65] Its touchtone is whether the

---

[60]   *Id.*

[61]   *Id.*

[62]   *Id.*

[63]   *Id.* In fact, Skinner was bickering with his supervisor, Josh Pippin, who also refused to shut the unit down as Murphy replaced Skinner in the basket and was injured.

[64]   *Kaplan v. Exxon Corp.*, 126 F.3d 221, 224 (3d Cir. 1997); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

[65]   *See, e.g., Stapas v. Giant Eagle, Inc.*, 153 A.3d 353, 371 (Pa. Super. 2016) (finding assumption of the risk remained viable defense but did not apply to that case). The Pennsylvania Supreme Court has twice attempted to abolish assumption of the risk, but was only able to obtain plurality support. *See Staub v. Toy Factory, Inc.*, 749 A.2d 522, 528 (Pa. Super. 2000) (citing

plaintiff, by voluntarily assuming a known risk, should be deemed to have abandoned his "right to complain" and forgive the defendant for any injuries it caused.[66]

Given that its application is a "drastic measure" barring a plaintiff's recovery,[67] to grant summary judgment on assumption of the risk as a matter of law a court must—conclusively and beyond question—find that the plaintiff was subjectively aware of a specific risk, voluntarily accepted it and acted in spite of that risk, and suffered harm contemplated by that specific risk.[68] The defendant's burden to establish assumption of the risk is a tall order because assumption of the risk requires knowledge of a specific risk.[69] "It is not enough that the plaintiff was *generally* aware that the activity in which he was engaged had accompanying risks.

---

*Howell v. Clyde*, 620 A.2d 1107 (Pa. 1993); *Rutter v. Northeastern Beaver County School District*, 437 A.2d 1198, 1206 (Pa. 1981)).

[66] *Fish v. Gosnell*, 463 A.2d 1042, 1049 (Pa. Super. 1983).

[67] *Bullman v. Giuntoli*, 761 A.2d 566, 569 (Pa. Super. 2000).

[68] *See, e.g.*, *Zeidman v. Fisher*, 980 A.2d 637, 641 (Pa. Super. 2009) ("[T]o grant summary judgment on the basis of assumption of the risk it must first be concluded, as a matter of law, that the party consciously appreciated the risk that attended a certain endeavor, assumed the risk of injury by engaging in the endeavor despite the appreciation of the risk involved, and that the injury sustained was, in fact, the same risk of injury that was appreciated and assumed.").

[69] *See, e.g.*, *Bullman*, 761 A.2d at 570 (explaining courts are reluctant to find assumption of the risk unless it is "quite clear that the specific risk that occasioned injury was both fully appreciated and voluntarily accepted"); *Barrett v. Fredavid Builders, Inc.*, 685 A.2d 129, 131-32 (Pa. Super. 1996) (requiring evidence to establish "conclusively" that "plaintiff was subjectively aware of the risk"); *Struble v. Valley Forge Military Academy*, 665 A.2d 4, 6 (Pa. Super. 1995) (establishing assumption of the risk as a matter of law "only where it is beyond question that the plaintiff voluntarily and knowingly proceeded in the face of an obvious and dangerous condition"); *Staub*, 749 A.2d at 529 (placing burden on defendant to establish assumption of the risk).

Rather, the plaintiff must be aware of 'the *particular* danger' from which he is subsequently injured in order to voluntarily assume that risk as a matter of law."[70]

With this backdrop in mind, the Court considers Excel's motion for summary judgment as to whether Excel has conclusively established as a matter of law that Murphy assumed the risk of injury thus relieving Excel of liability.

"Nearly all cases in this area focus on the element of the defense encompassing knowledge of the risk."[71] "Nevertheless, it is a two-step analysis and it is essential for us to review the voluntariness of the risk."[72] "Particularly enlightening are the emphasized portions of comment c [of the Restatement (Second) of Torts"[73]

> ... **A defendant who, by his own wrong, has compelled the plaintiff to choose between two evils** cannot be permitted to say that the plaintiff is barred from recovery because he has made the choice. **Therefore, where the defendant is under a duty to the plaintiff, and his breach of duty compels the plaintiff to encounter the particular risk in order to avert other harm to himself, his acceptance of the risk is not voluntary, and he is not barred from recovery.** It is true likewise where the plaintiff is compelled to accept the risk in order to exercise a right or protect a privilege, of which the defendant has no privilege to deprive him.[74]

---

[70] *Barillari v. Ski Shawnee, Inc.*, 986 F.Supp.2d 555, 562-63 (M.D.Pa. 2013) (citing *Bolyard v. Wallenpaupack Lake Estates, Inc.*, 3:10–CV–87, 2012 WL 629391, at *6 (M.D.Pa. Feb. 27, 2012).

[71] *Jara v. Rexworks Inc.*, 718 A.2d 788, 795 (Pa. Super. Ct. 1998).

[72] *Id.*

[73] *Id.*

[74] RESTATEMENT (SECOND) OF TORTS, § 496A, cmt. C (emphasis added).

Here, Kody Murphy did have knowledge of the risk of harm. In fact, multiple employees had knowledge of the risk of harm – Murphy, Skinner, Pippen, and, although disputed, Carnahan. However, the testimony of both Murphy and Skinner was that Carnahan, the acting supervisor, not only refused to shut the unit down, but also implicitly threatened their jobs if they did not continue working with the malfunctioning swivel unit. Carnahan's demands call into question the voluntariness of any assumption of the risk.

Moreover, employers cannot require that their employees use potentially dangerous equipment yet simultaneously attempt to escape liability for damages arising from the use of that equipment. The Pennsylvania Superior Court narrowed the assumption of the risk doctrine as it applies in the employment context in the matter of *Staub v. Toy Factory, Inc.*,[75] holding:

> [W]e conclude that in a negligence context, where an employee is required to encounter a risk in order to perform his job, reasonable minds could disagree as to whether the employee deliberately and with awareness of specific risks inherent in the activity nonetheless engaged in the activity that produced the injury.... A trial court should not, therefore, decide the issue as one of duty or lack thereof; instead, the issue should go to the jury as one of comparative negligence.[76]

---

[75] 749 A.2d 522, 526 (Pa.Super.Ct.2000).

[76] *McGuire v. United States*, No. CIVA 3:08-CV-1580, 2010 WL 1754444, at *4 (M.D. Pa. Apr. 27, 2010) (Caputo, J.) (*quoting Staub infra.*)

Applying *Staub*, Excel's attempt to shift the entirety of the onus to Murphy for his injury fails.[77] For all of the reasons delineated above, Excel's motion for summary judgment based on the assumption of the risk doctrine is denied.

### 2. Punitive Damages

Excel also argues that if its motion for summary judgment based on the assumption of the risk doctrine is not granted, that the Court should, at a minimum, dismiss the allegations of recklessness and the accompanying demand for punitive damages.

"Whether there is sufficient evidence to support a punitive damages award is a question of law."[78] "A jury may award punitive damages when it finds reckless, callous, intentional or malicious conduct."[79] "The defendant's conduct must be, at a minimum, reckless or callous. Punitive damages might also be allowed if the conduct is intentional or motivated by evil motive, but the defendant's action need not necessarily meet this higher standard."[80]

"Thus, in Pennsylvania, a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of

---

[77] *See also, Bailey v. B.S. Quarries, Inc.,* No. 3:13-CV-3006, 2016 WL 1271381, at *16 (M.D. Pa. Mar. 31, 2016) (Munley, J.) (holding that "genuine issues of material fact exist with respect to what Sherwood was doing at the time he fell into the crusher. We cannot, therefore, take the question of assumption of risk out of the hands of the jury.")

[78] *Alexander v. Riga,* 208 F.3d 419, 430 (3d Cir. 2000).

[79] *Springer v. Henry*, 435 F.3d 268, 281 (3d Cir. 2006) (*citing Smith v. Wade*, 461 U.S. 30, 54-56 (1983).

[80] *Springer*, 435 F.3d at 281 (*quoting Savarese v. Agriss*, 883 F.2d 1194, 1204 (3d Cir. 1989)).

the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk."[81]

In the matter at hand, there is sufficient evidence that Excel acted recklessly and callously. First, there is testimony from both Murphy and Skinner that Carnahan was the site supervisor on November 10, 2017 and knew of the malfunctioning swivel unit, yet refused to shut down the work. Second, Carnahan's testimony creates disputed facts as to these issues. The testimony, taken in the light most favorable to Murphy, the non-moving party, is that Carnahan was the acting supervisor, knew of the malfunction as early as November 9, 2017, yet chose to do nothing. Carnahan even testified that there is a "safety guy" whose job function was to ensure the safety of the equipment. Carnahan also testified that he knew that one of his job functions was to report safety issues. Carnahan could have reported the issue to the 'official' site supervisor, or alerted the 'safety guy,' on November 9, and the injury to Murphy could have potentially been averted.

I conclude that there are sufficient facts to present to a jury that demonstrate that Carnahan, as Excel's reluctant, yet acting, supervisor had a subjective appreciation of the risk of harm to which Murphy was exposed. I further conclude that Carnahan acted, or failed to act, as the case may be, in conscious disregard of

---

[81] *Hutchison v. Luddy*, 582 Pa. 114, 870 A.2d 766, 772 (2005).

that risk.[82] The motion to dismiss the punitive damages demand is therefore denied.

## III. CONCLUSION

For all of the foregoing reasons, the motion is denied in its entirety.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[82] *See, Hutchinson, supra.*